UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HODELL-NATCO INDUSTRIES, INC.<br>7825 Hub Parkway<br>Cleveland, Ohio 44125 | ) | CIVIL ACTION NO. 1:08 CV 2755 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| vs. | ) | |
| | ) | |
| SAP AMERICA, INC.<br>3999 W. Chester Pike<br>Newtown Square, Pennsylvania 19073 | ) | FIRST AMENDED COMPLAINT |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| and | ) | |
| | ) | |
| SAP AG<br>Dietmar-Hopp-Allee 16<br>69190 Walldorf, Germany | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LSI-LOWERY SYSTEMS, INC.<br>c/o Timothy K. Kellett, Registered Agent<br>911 Washington Avenue<br>Suite 400<br>St. Louis, Missouri 63101 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE IBIS GROUP, INC.<br>c/o John T. Grebe, Registered Agent<br>1749 Naperville Road<br>Suite 203<br>Wheaton, Illinois 60187 | ) | |
| | ) | |
| Defendants. | ) | |

Hodell-Natco Industries, Inc., by its attorneys, alleges as follows:

## NATURE OF THE ACTION

1.     This action is brought by the Plaintiff to seek redress for injuries sustained by it from the sale to Plaintiff of a SAP Business One software product that was wholly unsuited to Plaintiff's needs, was incapable of meeting the needs of a business the size of Plaintiff, which malfunctioned, which failed to function as represented, which had to be totally replaced, and which, Defendants knew or should have known, was unsuitable for the business needs of Plaintiff.  As a direct consequence of the acts and omissions set forth herein, Plaintiff has sustained business interruption, lost productivity, lost sales, lost profits, out-of-pocket expenses, and other direct, consequential, and special damages in an amount to be proved at trial, but conservatively estimated to be in excess of $1.5 million.

## PARTIES, JURISDICTION, AND VENUE

2.     Hodell-Natco Industries, Inc. ("Hodell-Natco" or "Plaintiff") is a corporation organized under the laws of the State of Ohio with its principal place of business in Valley View, Ohio.

3.     SAP AG is a corporation organized under the laws of the Republic of Germany with its principal place of business in Walldorf, Germany.  SAP AG is one of the world's largest business software companies – with more than 51,800 employees at sales and development locations worldwide. With subsidiaries in more than 50 countries, the company is listed on several exchanges, including the Frankfurt stock exchange and NYSE under the symbol "SAP."

4.      SAP America Inc. is a wholly-owned subsidiary of SAP AG.  SAP America Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Newtown Square, Pennsylvania.  At all times material hereto, SAP AG and SAP America, Inc. were commonly controlled and acted in concert with one another.  SAP AG and SAP America Inc. are collectively referred to herein as "SAP."

5.      LSi-Lowery Systems, Inc. is a corporation organized under the laws of the State of Missouri with its principal place of business in St. Louis, Missouri.

6.      The IBIS Group, Inc. is a wholly-owned subsidiary of LSi-Lowery Systems, Inc.  The IBIS Group, Inc. is a corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  At all times material hereto, LSi-Lowery Systems, Inc. and The IBIS Group, Inc. were commonly controlled and acted in concert with one another.  LSi-Lowery Systems, Inc. and The IBIS Group, Inc. are collectively referred to herein as "LSi."

7.      Complete diversity exists as no defendant is a citizen of the same state as Plaintiff.  The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS COMMON TO ALL CLAIMS

9.      Hodell-Natco is a full-service fastener and chain product wholesale distributor headquartered in Valley View, Ohio, with warehouses or sales offices in

3

Houston, Texas, Maryland Heights, Missouri, Sparks, Nevada, Blythewood, South Carolina, Wauwatosa, Wisconsin, Longwood, Florida, and Westfield, Massachusetts.

10.      Hodell-Natco has made numerous acquisitions, including: Bi-State Stainless Fasteners, North Ohio Bolt and Nut, Service Bolt and Nut Co., Metal Fasteners & Bolt Co. (including the Lok-Tooth division), Southwest Fasteners (Houston), Acton Stainless, and LMP Fastek (Milwaukee). Most recently, the company acquired the assets of Bonanza Nut & Bolt (Reno) and Western Chain Company (Chicago).  In December 2004, when Hodell-Natco purchased SAP Business One, it employed approximately 161 employees at least 80 of which were expected to be immediate users of SAP Business One.

11.      Hodell-Natco sells 160,000 to 170,000 different products generally classified as fasteners, chains, chain assemblies, and other products.  Because of the vast number of its products and multiple locations, having software that provides real time access to customer information, parts numbers, inventory and locations of inventory is essential to Hodell-Natco's business.

12.      In or about March 2002, SAP AG purchased TopManage Financial Systems, an Israeli developer of business applications and branded its system as "SAP Business One."  Subsequently, through acquisitions and otherwise, additional features and capability were added to SAP Business One.  At all times material hereto, SAP AG and SAP America Inc. acted jointly and in concert with one another to market and sell SAP Business One.

13.      During all material times, SAP Business One was marketed by SAP AG and SAP America Inc. through "a network of highly qualified channel partners" that

4

resell, build, implement or provide services for SAP products and solutions. In a publication entitled "SAP Solution Brief Qualified SAP All-in-One Partner Solutions" (07/02), SAP AG described the relationship as follows:

> With qualified SAP All-in-One partner solutions, you can have affordable industry-specific solutions that are created and delivered by SAP partners and qualified by SAP. (*Id.* at page 1.)
>
> ...
>
> SAP and its partners have extensive experience working with small and mid-size enterprises. Nearly half of all SAP customer installations are in companies with annual revenues of less than US$200 million. (*Id.* at page 2.)
>
> ...
>
> Qualified SAP All-in-One partner solutions are built and supported by a comprehensive network of SAP partners, all of which have extensive expertise in specific industries. SAP will help you identify the best partner for your needs, or you can choose one yourself, and you'll work with the partner to implement the software quickly and cost-effectively, and with minimal disruption to your business. (***Id.***)

Thus, SAP's "partners" are agents of SAP, having assented to act on behalf of, and subject to the control, of SAP.

14.     LSi-Lowery Systems, Inc. and/or The IBIS Group, Inc. were members of SAP's "partner" program and were authorized agents and resellers of SAP Business One.

15.     During all material times, LSi-Lowery Systems, Inc. and/or The IBIS Group, Inc. were duly authorized agents of SAP for the express purpose of making representations concerning the suitability and functionality of SAP Business One.

16.     In 2003, Hodell-Natco commenced a search for a software solution which would provide integrated financial and sales management capabilities for its growing

business.  It was essential to Hodell-Natco that whatever software it purchased would accommodate its then existing number of users (approximately 80) as well as accommodate the growth Hodell-Natco expected over the useful life of the software. Given the strategic investment in time and money, and the importance to the functioning of its business, it was also important to Hodell-Natco that it deal with a major software vendor with a high level of expertise, and a *proven* product supported with and by expert channel partners.

17.    Hodell-Natco expressly communicated its user capacity and other needs to all potential vendors, including the named Defendants herein.

18.    In 2003, Hodell-Natco was provided by SAP and/or a SAP "partner" with a copy of the SAP Business One Brief "SAP Business One" describing SAP Business One as "robust and fully integrated" software for businesses "with 10 to several hundred employees." It further represented: "Thousands of businesses in 15 countries are already using SAP Business One to help them manage and sustain their growth."    A contemporaneous marketing piece, "SAP Solution Brief" for SAP Business One, stated, in material part:

> SAP Business One provides robust and fully integrated financial and sales management capabilities, and it gives managers on-demand access to critical, real-time information for better decision making.  Whether you have 5 employees or 500, the solution helps emerging businesses streamline their operational and managerial processes. (*Id.* at page 1.)
>
> ...
>
> SAP Business One is easy to use for everyone in the organization – from the CEO to junior-level employees. (*Id.* at page 2.)
>
> ...

... SAP Business One is a revolutionary software solution from the largest software vendor in the world: SAP. (*Id.*)

...

Because SAP Business One is delivered through a network of highly qualified channel partners and supported by SAP's global resources, you receive first-class service and support. (*Id.* at page 3.)

...

Hundreds of businesses around the world are already using SAP Business One to help them manage and propel their growth. When you choose SAP Business One, you select SAP – a vendor with more than 30 years of experience and 12 million users worldwide.  And because SAP Business One is built on open standards, you can easily integrate it with other systems, including the solutions of mySAP Business Suite. (*Id.*)

Copies of this marketing literature are attached hereto as Exhibit "A."

19.    On October 1, 2003, Otto Reidl, President of Hodell-Natco, received an e-mail from Heather Devereuax from biz2bizmarketing.com containing attachments regarding SAP Business One – The American Express Edition.  In "Amex Edition OPT" dated June 2003, American Express described its product as "Finally, a seamlessly integrated business solution designed exclusively for small and midsize wholesales distributors: SAP Business One – The American Express Edition."  It further stated:

Specifically designed to address one of the biggest problems faced by small to midsize distributors, this solution seamlessly integrates wireless warehouse management, electronic data interchange (EDI), document management, sales tax and credit card authorization. (*Id.* at page 1.)

...

SAP Business One delivers access to real-time information. (*Id.*)

7

In the marketing literature entitled "New Solutions for Small and Midsize Businesses," SAP and American Express stated:

> American Express has teamed up with SAP, a world-leader in providing business software solutions to the Fortune 500. …[W]e have designed SAP Business One to meet the specific needs of SMBs in the United States. (*Id.* at page 1.)
>
> Together, we deliver world-class solutions and services through an impressive local network. (*Id.*)
>
> Our solution is easy to support. (*Id.* at page 2.)
>
> The SAP Business One solution effectively supports companies with as few as ten and as many as several hundred employees. (*Id.*)
>
> Worldwide, there are over 1,300 installations of SAP Business One. Now it's America's turn! (*Id.*)

Copies of Ms. Devereuax' e-mail and the attachments are attached hereto as Exhibit "B."

20.      At all times relevant to this action, American Express Tax and Business Services, Inc. acted as the authorized agent and representative of its disclosed principals, the SAP Defendants.  As described hereafter, American Express's role was eventually transitioned to the defendants LSi-Lowery and IBIS.

21.      On October 16, 2003, Penelope A. Vitantonio of American Express Tax and Business Services, Inc. sent Otto Reidl an e-mail that had attached "a technical whitepaper and a collateral piece" regarding SAP Business One – The American Express Edition.  A copy of the "SAP Business One Whitepaper" which accompanied Ms. Vitantonio's message is attached hereto as Exhibit "C."  In it SAP AG represented, in part:

> SAP – 30 Years in the Business of Helping Businesses Grow
> 12 Million Users.  61,100 Installations.  1,500 Partners.  23 Industry Solutions.  (Page 1.)

8

...

> Headquartered in Walldorf, Germany, SAP is the world's largest inter-enterprise software company, and the world's third-largest independent software supplier overall. ... Our professionals are dedicated to providing high-level customer support and services. (*Id.*)

...

> For small and midsize companies eager to emerge as new leaders in their industry, taking that next step in e-business evolution is a critical decision. Their new business management software must be quick to implement, easy to use, and make the best use of their current IT infrastructure. While it must be sufficiently powerful to manage their business through its future growth, it has to be affordable enough to represent a reasonable investment today. (§ 1.1, p. 4.)

...

> **The software has been successfully installed in 800 businesses globally, with the maximum implementation time being four weeks.** (Emphasis added.)(§ 1.4, p. 5.)

...

> SAP Business One, the powerful solutions platform for small and medium-size businesses, gives you fast and easy access to all corporate information, complete reports, and useful documents for all business processes -- and everything in real time. (§ 2, p. 6.)

...

> To secure critical business and system processes, a robust MS-SQL 2000 database is used. It supports an unlimited number of simultaneous user transactions. In addition, its scalability provides for expansion of business activities while simultaneously securing and controlling all business processes. (§ 4, p. 18.)

22.    On October 20, 2003 at 1:00 p.m., Hodell-Natco participated in an Online

Webinar and Demonstration presented jointly by SAP, American Express, and IBM.

During the course of the Webinar, the suitability of SAP Business One for small and midsize wholesale distributors was specifically represented to the attendants, including Otto Reidl. The Webinar was conducted by, or was conducted under the supervision of the SAP Defendants, and the representations made therein were authorized by, and made on behalf of, the SAP Defendants.

23.     On November 3, 2003, in a telephone conversation with Otto Reidl, Penelope A. Vitantonio told Otto Reidl that "IBIS will be partnering with American Express" and suggested the postponement of a then scheduled meeting between Hodell-Natco and American Express.

24.     In late 2003, The IBIS Group, Inc. represented to Hodell-Natco that it was an expert in providing IT solutions to the fastener industry and that "SAP has chosen to partner with The IBIS Group to develop the specific requirements of this vertical market space and bring to market a turn key solution (sic) to this industry." Those specific requirements included, but were not limited to, enhanced accounts receivable functionality, enhanced accounts payable functionality, enhanced inventory control functionality, enhanced sales orders functionality, and enhanced purchase orders functionality. Development of that vertical market space also included the integration of other software with SAP Business One, including the In-Flight Enterprise application and Radio Beacon synchronization.

25.     On December 3, 2003, Penelope A. Vitantonio and Michael J. Neuendorff of American Express Tax and Business Services, Inc. met with Otto Reidl as part of the ongoing effort to sell SAP Business One to Hodell-Natco. At that (or perhaps another contemporaneous meeting), Otto Reidl was given the documents comprising Exhibit "A,"

repeating the express representation that SAP Business One was suitable for mid-size businesses with as many as 500 employees.

26.     On December 19, 2003 at 3:30 p.m., Otto Reidl received a telephone call from Penelope A. Vitantonio and Eric Worth.  Otto Reidl's notes of this conversation evidence that the "scalability" of SAP Business One was expressly discussed leaving Otto Reidl with the assurance that SAP Business One had sufficient capability to serve a business the size of Hodell-Natco.

27.     During 2004, communications between Hodell-Natco and The IBIS Group, Inc., and its owner, Dale Van Leeuwen, continued.  After the announcement of the acquisition of IBIS by Lowery Systems, Inc. in June 2004, Daniel Lowery of LSi-Lowery Systems, Inc. joined in the efforts to sell SAP Business One to Hodell-Natco.  As a consequence of the acquisition, Dale Van Leeuwen became Chief Operating Officer of LSi-Lowery Systems, Inc.   Meetings and/or telephone conversations occurred on February 2, 2004 (conference call among Hodell-Natco, IBIS and American Express); February 6, 2004 (Otto Reidl and Penelope A. Vitantonio); September 10, 2004 (Otto Reidl, Daniel Lowery and Dale Van Leeuwen); October 13, 2004 (conference call Hodell-Natco and LSi-Lowery Systems, Inc.); October 14, 2004 (Otto Reidl, Kevin Reidl, Daniel Lowery and Dale Van Leeuwen); November 3, 2004 (Otto Reidl, Daniel Lowery, John Woodrum and Dale Van Leeuwen); November 8, 2004 04 (Otto Reidl, Daniel Lowery and Dale Van Leeuwen); and November 23, 2004 (conference call Hodell-Natco and LSi-Lowery Systems, Inc.). Not once during any of these conversations, or during any other oral communication, or in any written communication, was Otto Reidl or anyone else at Hodell-Natco told that SAP Business One was

unsuitable for mid-size businesses and could support only a limited number of users.  Not once was Otto Reidl or anyone else at Hodell-Natco told that SAP Business One could not be installed at Hodell-Natco in a reasonably functioning form.   Not once was Otto Reidl or anyone else at Hodell-Natco told that there existed only mediocre or poor support for SAP Business One.  Not once was Otto Reidl or anyone else at Hodell-Natco told that the installation of SAP Business One would take multiple months, and then be incomplete.

28.     During the course of the communications set forth herein, and in the written materials provided to Hodell-Natco:

a.  SAP Business One was jointly marketed to Hodell-Natco by all of the Defendants as an affordable and easy to implement solution designed from the ground up to address the needs of small and midsize businesses ("SMBs").

b.  SAP Business One was jointly represented by the Defendants to Hodell-Natco as providing robust and fully integrated financial and sales management capabilities.

c.  SAP Business One was jointly represented by the Defendants to Hodell-Natco as providing managers on-demand access to critical real time information.

d.  SAP Business One was jointly represented by the Defendants to Hodell-Natco as the one solution designed for key decision makers that helped them do it all – make more profitable decisions, grow their businesses, and stay ahead of their competition.

e.  SAP Business One was jointly represented by the Defendants to Hodell-Natco as being an affordable, powerful business solution that allowed everyone in the organization to get the information they need – in real time.

f.  SAP Business One was jointly represented by the Defendants to Hodell-Natco as providing it with the ability to manage practically all of its core operations, including the following features and benefits:

  i.  Salesforce automation, pipeline tracking, opportunity management, strategic selling, and contact management;

  ii.  Full financial management system, budgeting, and bank reconciliation;

  iii.  Inventory management, warehouse management, and multilevel price lists;

  iv.  Management reporting, online alerts, sales discount management, exception management, and workflow approvals;

  v.  A user interface designed for nontechnical executives;

  vi.  Unparalleled ease of use;

  vii.  Increased employee productivity and enhanced communication with suppliers; and

  viii.  "Unmatched expertise."

29.  On December 17, 2004, Daniel Lowery of LSi-Lowery Systems, Inc. sent an e-mail to Otto Reidl stating, "Attached is *the final agreement* containing the wording we discussed, namely; that at the 150 day review point, Hodel (sic) can ask for a refund of their $60,000 if IBIS is substantially behind schedule." (Emphasis added.)

13

30.   On December 20, 2004, Hodell-Natco executed the Development Agreement with LSi, a copy of which is attached hereto as Exhibit "D" (the "Development Agreement").

31.   On December 20, 2004, Hodell-Natco issued its purchase order for an 80 user software license for SAP Business One at a cost for the licenses alone of $300,000.00. On December 21, 2004, Hodell-Natco issued check number 354550 in the amount of $60,000 as its initial payment toward the purchase of the 80 user licenses. Copies of the purchase order and check are attached hereto as Exhibit "E" (the "Purchase Order").

32.   On December 20, 2004, LSi-Lowery Systems, Inc. issued an invoice to Hodell-Natco for 80 user software licenses for SAP Business One. A copy of the invoice is attached hereto as Exhibit "F."

33.   The documents referenced in paragraphs 29-32 constitute the entire contract and agreement for the purchase of 80 user software licenses for SAP Business One by Hodell-Natco. The SAP Defendants were third party beneficiaries of the contract and agreement described in paragraphs 29-32 of this Amended Complaint.

34.   Essential to Hodell-Natco's decision to purchase SAP Business One was the express representation by the Defendants that SAP Business One would support the many users employed by Hodell-Natco. It was understood between Hodell-Natco and the Defendants that Hodell-Natco would be purchasing up to an additional 220 licenses for SAP Business One beyond the 80 initially purchased. Hodell-Natco anticipated a need for a total of 300 licenses during a ten-year period of use.

35.    Hodell-Natco would not have purchased the initial 80 licenses without the Defendants' intentionally misleading, reckless, and/or negligent assurances that Hodell-Natco would be able to expand the number of licenses beyond the initial 80 and up to 300 total.

36.    The Defendants expressly represented to the international business community that SAP Business One could be used by hundreds of users.  In its 2003 Annual Report, for example, SAP stated:

> SAP Business One is an easy-to-use business automation software solution that enables emerging businesses to streamline their operational and managerial processes and gain better control of their businesses.  It supports standard business processes such as financial management, warehouse management, purchasing, inventory management,, payment, and sales force automation. ... *SAP Business One targets organizations with ... five to 500 employees...."* (Emphasis added.)

37.    The Defendants expressly represented to Hodell-Natco that SAP Business One could be used by as many as 250 users and that SAP Business One was suitable to Hodell-Natco's current and at least ten years of future growth needs.

38.    The Defendants expressly represented to Hodell-Natco that SAP Business One was a proven "robust and fully integrated" product that had been successfully installed in 800 businesses and that none of the installations took more than four (4) weeks.

39.    The Defendants expressly represented to Hodell-Natco that if it purchased SAP Business One, then Hodell-Natco would receive "high-level" customer support and services and that such services would be tailored to the specific needs of Hodell-Natco's particular industry.

40.    Hodell-Natco justifiably relied upon the material representations of SAP and LSi as set forth in this Complaint.

41.    The representations made by the Defendants as set forth in this Complaint were made falsely -- either with knowledge of their falsity or utter disregard and recklessness as to falsity -- with an intent to mislead customers for SAP Business One, including Hodell-Natco.

42.    The annual reports and marketing literature publicly disseminated by SAP AG and SAP America Inc. reveal that over time, SAP AG and SAP America Inc. have steadily narrowed their statements about the number of employees and/or users that can be supported by SAP Business One.  This is illustrated by the following chart:



| | |
|---|---|
| 10/2003 | 500 Employees – SAP Brochure |
| 2003 Ann. Report | 5 – 500 Employees |
| 10/2004 | < 250 Employees – SAP news release (Ellen O'Brien, SAP.com) |
| 12/2004 | Hodell-Natco contract for 80 user licenses |
| 2005 Ann. Report | 10 – several hundred employees |
| 11/2005 | 10 – 100 users – Article about new SAP-_news release |
| 12/2005 | Purchase by Hodell-Natco of 40 "CRM" licenses |
| 11/2006 | < 250 Employees – SAP Executive Summary |
| 2006 Annual Report | < 100 Employees |
| 2007 Ann. Report | < 100 employees with < 30 users |

43.    That SAP Business One was totally unsuitable for a company the size of Hodell-Natco is acknowledged by what SAP AG publicly stated in its 2007 Annual Report about its SAP Business One software product:

> SAP Business One is the right solution *for small businesses, typically with fewer than 100 employees and 30 users* that are looking for an affordable, single system to cover the core operations necessary to run and grow a success business, including financials, sales, customers, and operations. (Emphasis added.)

44.    With sales of less than $50 million, Hodell-Natco was far below the $200 million used by SAP to define the upper limit of "mid-sized" businesses.

45.    By the time 80 user software licenses for SAP Business One were sold to Hodell-Natco in December 2004, SAP AG and SAP America Inc. knew, or were reckless in not knowing, that SAP Business One could not reasonably support more than 30 users.

46.    In or about December 2005, Hodell-Natco purchased "40 CRM" user licenses from The IBIS Group, Inc.  In connection with this purchase, Hodell-Natco was presented with the Maintenance Schedule and SAP Business One Software License Agreement attached hereto as Exhibit "G."  Hodell-Natco signed these documents but never received back a counterpart signed by SAP America Inc.

47.    By the time 40 CRM user software licenses for SAP Business One were sold to Hodell-Natco in December 2005, SAP AG and SAP America Inc. knew, or were reckless in not knowing, that SAP Business One could not reasonably support more than 30 users.

48.    Following its purchase of 80 user licenses for SAP Business One in December 2004, Hodell-Natco worked diligently to implement the software with the assistance of the Defendants.  Notwithstanding the best efforts of Hodell-Natco, the

installation of SAP Business One was an abject failure.  Hodell-Natco continued its efforts to make SAP Business One minimally functional until 2008 when it reached the conclusion that SAP Business One had failed and that it needed to be replaced.

49.    The many problems encountered by Hodell-Natco with SAP Business One and the integrated software include, but are not limited to:

a.    The system responded so slowly that Hodell-Natco's sales force was unable to reasonably respond to customer inquiries by telephone;

b.    InFlight disconnect errors;

c.    There were data synchronization failures between SAP Business One and Radio Beacon;

d.    There were ongoing discrepancies between package on-hand and warehouse on-hand figures;

e.    Faxes were sent to incorrect customers by SAP Business One;

f.    Not all documents to be faxed by SAP Business One were actually faxed, some instead were printed locally;

g.    SAP Business One e-mailing failed without any apparent pattern;

h.    Could not reset to zero usage;

i.    SAP Business One screen froze when looking up past sales to customers;

j.    SAP Business One form settings sporadically changed from one day to the next following no apparent pattern;

k.    Repeated "Internal error 2038" messages;

l.    IP misapplied costs;

m.    Item interchanges were not functional;

n.      Order entry failures with no apparent pattern;

o.      Transfer lines remained open or closed at random on receipt of partial shipment data;

p.      Country of origin did not uniformly carry through system; and

q.      Drill downs only functioned occasionally without an apparent pattern to the repeated failures.

50.      On April 25, 2007 Dan Lowery of LSi-Lowery Systems, Inc. wrote an e-mail to Kevin Reidl of Hodell-Natco following upon a communication had on April 24, 2007 with Dirk Boessmann of SAP AG.  During the course of that message, Mr. Lowery stated, **"Number of users for SAP B1?  Yes, at the early stages we all started with B1, the number most often quoted for *users* was 250+.  On the call you correctly heard Hodell was pushing the upper limit with 120."**  (Emphasis added.)  A copy of Mr. Lowery's April 25, 2007 e-mail is attached hereto as Exhibit "H."

51.      On September 6, 2007, Otto Reidl received a telephone call from Dale Van Leeuwen who admitted that initially SAP Business One had been represented to Hodell-Natco as being capable of supporting up to 300 users, but that by May of 2006, SAP had reduced the number to 50.

52.      The statements of Messrs. Lowery and Van Leeuwen as set forth in the previous two paragraphs constitute admissions against interest and clearly establish that Hodell-Natco was materially misled as to the adequacy of SAP Business One for its business needs.

53.    Hodell-Natco incurred damages as direct costs in the implementation of SAP Business One and the integrated software in an amount to be proved at trial, but at least $843,152.62.

54.    Hodell-Natco incurred damages as indirect costs in the implementation of SAP Business One and the integrated software in an amount to be proved at trial, but at least $456,000.

### FIRST CAUSE OF ACTION-FRAUDULENT INDUCEMENT

55.    Hodell-Natco incorporates the previous paragraphs of this Complaint as if fully rewritten herein.

56.    Defendants made material misrepresentations of fact in their sales literature, public and private communications in 2003 and 2004, and directly to Hodell-Natco.  Those misrepresentations are set forth in detail herein and include, but are not limited to, the misrepresentation that SAP Business One was suitable for companies with hundreds of employees, that SAP Business One was suitable for 250 users, that SAP Business One had been successfully installed in hundreds of similar companies, and that SAP could provide industry-specific high level support.

57.    The misrepresentations by the Defendants were of material facts.

58.    Hodell-Natco reasonably relied on the misrepresentations of the Defendants in (i) the purchase of 80 user licenses for SAP Business One; (ii) the purchase of unlimited user licenses for the IBIS In-Flight Enterprise software; (iii) the purchase of the programs to integrate the In-Flight Enterprise application with SAP Business One; and (iv) the purchase of 40 "CRM" user licenses.

20

59.     The misrepresentations by the Defendants were made with knowledge of their falsity or utter disregard and recklessness as to falsity -- with an intent to induce and mislead Hodell-Natco into making the purchases as aforesaid.  Hodell-Natco would not have entered into the contracts attached as Exhibits "D" and "E" but for its justifiable reliance on the fraudulent misrepresentations of the Defendants.

60.     The material misrepresentations discussed herein were made not only in order to induce Hodell-Natco to purchase the initial 80 user licenses, but further, with the intent to induce Hodell-Natco to forgo other potential business partnerships in favor of the previously described business partnership with LSi-Lowery and the SAP Defendants.

61.     In December 2005, the SAP Defendants made additional representations regarding Hodell-Natco's "limited one-time opportunity" to purchase additional user licenses to expand its number of users beyond the initial 80 licenses.   These representations were made knowingly, or with reckless disregard for their truth, and the SAP Defendants knew or should have known that the initial 80 licenses would fail to perform based upon information solely in their possession, and the additional licenses would likewise fail to perform.

62.     The misrepresentations described Paragraph 61 above not only furthered the Defendants' ongoing fraudulent scheme, but were also specifically designed to induce Hodell-Natco to sign a License Agreement containing certain disclaimers and other limitations.

63.     Hodell-Natco would not have signed the 2005 License Agreement had the Defendants corrected their previous misrepresentations surrounding the Development Agreement, and would not have signed the License Agreement had the SAP Defendants

21

not made additional misrepresentations in December 2005, knowing that SAP Business One would fail for Hodell-Natco's intended purpose.

64.    At the time the Defendants made their representations regarding the Development Agreement and License Agreement, the Defendants knew that they had no intention and/or no ability to perform their contractual obligations.

65.    Hodell-Natco has sustained damages from the Defendants' fraudulent inducement as alleged herein.

## SECOND CAUSE OF ACTION-FRAUD

66.    Hodell-Natco incorporates the previous paragraphs of this Complaint as if fully rewritten herein.

67.    Defendants made material misrepresentations of fact in their sales literature, public and private communications in 2003 and 2004, and directly to Hodell-Natco.  Those misrepresentations are set forth in detail herein and include, but are not limited to, the misrepresentation that SAP Business One was suitable for companies with hundreds of employees and that SAP Business One was suitable for 250 users.

68.    The SAP Defendants further represented that installation of SAP Business One could be readily undertaken and that Hodell-Natco would receive high-level and industry-specific support, when in fact the support was poor at best.

69.    The SAP Defendants represented in 2003 that SAP Business One was being used by thousands of businesses in 15 countries when in fact the number of installations was far smaller.

70.    The misrepresentations by the Defendants were of material facts.

71.     Hodell-Natco reasonably relied on the misrepresentations of the Defendants.

72.     The misrepresentations by the Defendants were made with knowledge of their falsity or utter disregard and recklessness as to falsity -- with an intent to mislead Hodell-Natco.

73.     Hodell-Natco has sustained damages from the Defendants fraud as alleged herein.

### THIRD CAUSE OF ACTION-BREACH OF CONTRACT

74.     Hodell-Natco incorporates the previous paragraphs of this Complaint as if fully rewritten herein.

75.     The Development Agreement, together with Hodell-Natco's Purchase Order constitutes a valid and binding agreement between Hodell-Natco and LSi for (i) the purchase of SAP Business One and 80 user licenses for SAP Business One; (ii) the purchase of unlimited user licenses for the IBIS In-Flight Enterprise software; and (iii) the purchase of the programs to integrate the In-Flight Enterprise application with SAP Business One.

76.     The software sold to Hodell-Natco are "goods" and/or "specially manufactured goods" under the Uniform Commercial Code.

77.     SAP was a disclosed principal for whose benefit LSi contracted with Hodell-Natco. For this and other reasons, SAP is liable for any breaches which may be established against LSi.

78.     As the principal for its disclosed agent LSi, and because the SAP Defendants were specifically intended to benefit directly from the Development

Agreement, the SAP Defendants are third-party beneficiaries of the Development Agreement and are liable for any breaches thereof.

79.    Hodell-Natco fully performed all of its duties under the Development Agreement and any and all other agreements which may be deemed binding upon Hodell-Natco.

80.    Implied in the Development Agreement are an implied warranty of merchantability and an implied warranty of fitness for a particular purpose.

81.    LSi materially breached its contract with Hodell-Natco and the implied warranties of merchantability and fitness for a particular purpose.

82.    The software sold to Hodell-Natco was not fit for the ordinary purposes for which software of that description is used.

83.    The software sold to Hodell-Natco was not fit for the particular purposes for which that software was to be employed by Hodell-Natco, which purposes were known to LSi and SAP.  LSi and SAP knew that Hodell-Natco was relying on their skill in the selection and recommendation of suitable software.

84.    In the event that Hodell-Natco should be deemed to be bound by the terms of the SAP Business One Software License Agreement for the December 2005 purchase of 40 "CRM" user licenses, then Plaintiff alleges that the warranty set forth in paragraph 7.1 was breached as the software did not substantially conform to the functional specifications contained in the "documentation."

85.    LSI and SAP otherwise materially breached their contracts with Hodell-Natco.

86.    Hodell-Natco has sustained damages from the Defendants breach of contract as alleged herein.

## FOURTH CAUSE OF ACTION-NEGLIGENCE

87.    Hodell-Natco incorporates the previous paragraphs of this Complaint as if fully rewritten herein.

88.    LSi and SAP had a duty of ordinary care to Hodell-Natco.

89.    By failing to cause the SAP Business One software to achieve basic and essential functionality for Hodell-Natco, Defendants breached their duty of care.

90.    Hodell-Natco has sustained damages from the Defendants' negligence as alleged herein.

## FIFTH CAUSE OF ACTION-NEGLIGENT MISREPRESENTATION

91.    Hodell-Natco incorporates the previous paragraphs of this Complaint as if fully rewritten herein.

92.    In the course of their business, the defendants supplied false information to Hodell-Natco with respect to the capabilities of SAP Business One which information was supplied to Hodell-Natco for the guidance of Hodell-Natco in its purchase of business software.

93.    Defendants failed to exercise reasonable care or competence in communicating such information to Hodell-Natco.

94.    Hodell-Natco justifiably relied upon the information relating to SAP Business One supplied to Hodell-Natco by the defendants.

95.    Hodell-Natco has sustained damages from the Defendants' misstatements and omissions as set forth herein.

**WHEREFORE**, Hodell-Natco prays for judgment as follows:

a.      As to the First Cause of Action, damages in an amount to be proved at trial, but at least $1.5 million, interest thereon, punitive damages, and attorneys' fees;

b.      As to the Second Cause of Action, damages in an amount to be proved at trial, but at least $1.5 million, interest thereon, punitive damages, and attorneys' fees;

c.      As to the Third Cause of Action, damages in an amount to be proved at trial, but at least $1.5 million, interest thereon, and attorneys' fees;

d.      As to the Fourth Cause of Action, damages in an amount to be proved at trial, but at least $1.5 million, interest thereon, and attorneys' fees;

e.      As to the Fifth Cause of Action, damages in an amount to be proved at trial, but at least $1.5 million, interest thereon, and attorneys' fees;

f.      As to all causes of action, costs and reasonable experts' fees;

g.      Any other relief which this Court deems just and equitable.

Respectfully submitted,

/s/ James F. Koehler
James F. Koehler (0007904)
Koehler@buckleyking.com
Buckley King, LPA
1400 Fifth Third Center
600 Superior Ave.
Cleveland, Ohio 44114
(216) 363-1400
(216) 579-1020 (Fax)
Attorneys    for    Plaintiff   Hodell-Natco
Industries, Inc.

## JURY DEMAND

Plaintiff hereby demands trial of this matter with the maximum number of jurors allowed by law.

/s/ James F. Koehler
James F. Koehler (0007904)
Attorney for Hodell-Natco Industries, Inc.

CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2009, I electronically filed the foregoing First

Amended Complaint, Jury Trial Demanded, using the CM/ECF system.


/s/ James F. Koehler
James F. Koehler (0007904)

#99433v2